398 A.2d 320 (1979)
Lyda Ann Q. THOMAS, Individually and as Custodian for Eliza McIntyre Thomas, Ian Thomas, Taylor Thomas, and Zachary Cecil Kempner Thomas, and J. Redmond Thomas, Individually, Plaintiffs,
v.
Harris L. KEMPNER, Sr., Harris L. Kempner, Jr., Thomas L. James, Cecile Kempner, I. H. Kempner, Peter K. Thompson, Harris K. Weston, Alan Pryce-Jones, and Sugarland Industries, Inc., a Delaware Corporation, Defendants.
Court of Chancery of Delaware, New Castle County.
Submitted October 12, 1978.
Decided January 26, 1979.
Andrew B. Kirkpatrick, Jr., Richard L. Sutton, and William T. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Dempsey J. Prappas and Brantly Harris, of Prappas, Moncure, Harris & Termini, Houston, Tex., for plaintiffs.
Charles F. Richards, Jr., Allen M. Terrell, Jr., and Donald A. Bussard, of Richards, Layton & Finger, Wilmington, and Ben G. Sewell, of Sewell, Junell & Riggs, Houston, Tex., for the individual defendants, and as special counsel for defendant Sugarland Industries, Inc.
Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, for defendant Sugarland Industries, Inc.
Bruce M. Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington, for United States Nat. Bank of Galveston, Trustee, a stockholder of Sugarland Industries, Inc., intervenor.
*321 MARVEL, Chancellor:
In 1973, the principal asset of the defendant Sugarland Industries, Inc. was what at one time had presumably been at various times a sugar, rice and cotton plantation made up of some 7500[1] acres of diked lowland, located in the valley of the Brazos River approximately twenty miles southwest of the business center of Houston, Texas, and easily accessible from such city by freeway, the principal use made of said lands having continued to have been agricultural in nature until comparatively recent times.
As long ago as 1964, however, the board of directors of Sugarland Industries, which at the time (except for one member[2] who had been a long time officer) was made up of stockholder members of the Kempner family, which has held substantial amounts of property in Texas and elsewhere for many years, including an interest in virtually all of the issued stock of Sugarland Industries, either directly or through charitable corporations and trusts, because of the decline in agricultural productivity on the *322 plantation and also for tax reasons, had begun to discuss among themselves the desirability and possibility of liquidating their corporation either through an exchange of shares of stock, preferably on a tax free basis, or by a direct sale of its assets, and in late 1969 or early 1970 commissioned the Houston real estate firm of Allison-Bullitt & Associates to prepare an appraisal of Sugarland Industries' principal asset, namely its real estate. Simultaneously, the board of directors of Sugarland Industries authorized the preparation of a land investment management study of its real estate by Dr. Peter Wolf of New York, an expert in land valuation and use. Later, in August, 1970, armed with the studies referred to above, and after preliminary discussions with Houston members of the firm of Lehman Brothers, Harris L. Kempner, a director of Sugarland Industries and at the time the recognized spokesman for a large majority of the Kempner family of some sixty members with a direct or indirect interest in shares of stock of Sugarland Industries, although himself the holder of only one-third of one percent of the stock of the corporation, wrote to Lehman Brothers' office in Houston on behalf of the board of directors of Sugarland Industries as follows:
"This letter will serve to confirm agreement reached between us whereby we give Lehman Bros. a period of nine months from date on an exclusive basis, to find a buyer or merger partner for this corporation at the value[3] stated by us in our conference on August 12, and preferably on a tax free exchange basis. Naturally, any sale or exchange will be subject to our stockholders' approval.
"It is further agreed that if and when a trade is consummated, we will pay Lehman Bros. a fee of 2% of the value of the exchange."
Significantly, James C. Kempner, a nephew of Harris L. Kempner and a first cousin of the plaintiff Lyda Ann Thomas, was at the time not only a director of Sugarland Industries but also an employee of Lehman Brothers. In any event, representatives of Lehman Brothers had evidently persuaded the board of directors of Sugarland Industries that if the sale of its real estate were to be accomplished through an exchange of securities, as planned, that Lehman Brothers, a firm of sophisticated investment brokers, was better qualified to dispose of the property in question than a conventional real estate broker and furthermore that in the Houston area, at least, Lehman Brothers had made an extensive and successful record in disposing of large tracts of real estate. According to the record, during the year, running from August 1970 to August 1971, Lehman Brothers got in touch with forty large corporations concerning the possible sale of the lands here in issue. However, negotiations with several would-be buyers having come to naught despite tentative agreements, and the nature of the proposed sale of the real estate in issue having meanwhile apparently been converted from a sale to be accomplished through a tax free exchange of securities to an outright disposal of lands[4] of the corporation, James C. Kempner, a director of Sugarland Industries, in August, 1972 learned that the firm of White and Hill, local real estate developers, might possibly be interested in acquiring some if not all of the real estate here in issue. Thereafter, the format of negotiations with White and Hill having temporarily reverted to that of a proposed sale of shares of stock, and the subject matter of such negotiations having become confined to the south tract alone, by December 1, 1972, a stock sale agreement for the proposed acquisition of the south tract by White and Hill had been substantially drafted except for a listing thereon of encumbrances *323 and conditions on the proposed transaction, and, on or about December 7, 1972, copies of such agreement were mailed to all stockholders of Sugarland Industries, Inc. White and Hill appears to have executed such agreement on December 18, 1971, and by the end of the month all stockholders of Sugarland Industries, other than plaintiffs, had either executed the proposed agreement of sale of the south tract less the so-called park tract of some 230 acres, which had been given an estimated sale's price of $400,000, for a total net price of $23,800,000, or had agreed so to do. However, efforts to obtain plaintiffs' participation in a proposed unanimous vote of the stockholders of the corporation, their consent to the sale of their 1.97% interest in the stock of Sugarland Industries for a sum in excess of $350,000, or the conveyance to Mr. and Mrs. Thomas of an interest in real estate of Sugarland Industries proportionate to their interest in stock of said corporation having been rejected by the Thomases, the directors revived the plan of an outright sale of corporate real estate, and negotiations looking towards such a transaction were thereafter entered into with both Ayrshire Corporation and Realamerica Corporation, both companies having evinced an interest in acquiring the north tract along with the then highest prospective bidder for said tract, namely Morris-Glenney & Company, while negotiations for the sale of the south tract continued to be carried on with representatives of White and Hill.
However, in early February, 1973, it came to the attention of Brantly Harris, a partner in the firm of Prappas, Moncure, Harris & Termini, Houston counsel for plaintiffs, through one Don Mafrige, that Fred Rizk, a local developer, had become interested in the south tract in issue, and a tentative form of option agreement was worked out by means of which plaintiffs would be able to acquire through Mr. Mafrige, as trustee, for 110% of the allocated per acre price which might be paid for the remainder of the south tract by the Rizk group the relative small acreage which plaintiffs wanted. Thus, under the terms of the proposed option if the Rizk group were to purchase the rest of the south tract for $30,000,000, plaintiffs would have an option to purchase a 43 acre tract at 110% of the allocated price per acre of $18,750, namely for the sum of $836,875. Accordingly, under the terms of the so-called Mafrige option it was to plaintiffs' advantage, insofar as they wished to acquire land of Sugarland Industries, to have the Rizk group pay as little as possible for the main part of the south tract. Thereafter, in early February, with the knowledge of Brantly Harris, plaintiffs' counsel, but without directly informing the directors of Sugarland Industries, a joint venture was formed by Fred Rizk and a Mr. Cummins of the Houston real estate firm of Shindler-Cummins, such group thereafter being known as RSC, which thereupon agreed to make an offer to buy the south tract through Mr. Mafrige as trustee, and while being prepared to bid as much as $30,000,000 for such tract, initially offered $27,000,000.
In the meantime, however, the board of directors of Sugarland Industries was proceeding towards the completion of a firm agreement of sale of the south tract to White and Hill, having sent out notices for a special meeting of stockholders of the corporation to be held on March 7, 1973 for the purpose of voting on a resolution authorizing the directors of the corporation to dispose of corporate property and assets for such consideration as the board of directors:
"* * * deems expedient and for the best interest of the company * * *"
and
"4. To consider and act upon any agreements for the sale or exchange or the assets of the Company which the Board may have negotiated as of the date of the meeting of shareholders."
There then ensued a contest between proponents of the proposed RSC offer to purchase the south tract for $27,000,000 with a downpayment in cash of $5,540,000 and a note for the balance of $21,460,000 and those of the White & Hill proposal of $23,800,000 for the same tract, with a downpayment in cash of $5,000,000 and a note for the balance of $18,800,000, both notes having *324 only the land to be purchased as security for the balance due, over which prospective buyer should succeed in acquiring the south tract, Mr. Griffith, counsel for Sugarland Industries, eventually assuring counsel for RSC that the stockholders' vote on the proposed sale of the south tract would be postponed until substantially all of the stockholders of Sugarland Industries, Inc. had had an opportunity to examine the material submitted on the subject by the corporation, its directors, as well as by plaintiffs' proposed letter of March 1, 1973.
On March 2, 1973, a new RSC proposal, modeled after the White and Hill proposal of February 2, 1973, was presented to Mr. Jones, a member of the board of directors of Sugarland Industries and its former president, which restated the offer to buy the south tract for $27,000,000. This was followed by a submission of a check by RSC to Sugarland Industries on March 4, 1973 in the amount of $250,000 despite the fact that Dempsey J. Prappas and Brantly Harris, counsel for RSC as well as for plaintiffs, had been notified on or about March 1, 1973 that White and Hill had apparently either satisfied or waived certain conditions precedent to a successful buyer's obligation to qualify to close on the transaction in issue, which conditions had to do with required governmental approval of a prospective buyer's proposed use of the lands in issue, while the new RSC proposal apparently still contained conditions precedent to such a closing.
On March 2, 1973, fearful that the members of the board of directors of Sugarland Industries, under the apparent influence of Harris L. Kempner, had closed their minds to the possibility of the purchase of corporate lands by anyone other than White and Hill even though a higher bid was to be made, Mr. Prappas consulted counsel in Delaware concerning possible litigation by the present plaintiffs to block such proposed sale by reliance on the provisions of 8 Del.C. Section 271 and the case of Robinson v. Pittsburgh Oil Refining Corp., Del.Ch., 126 A. 46 (1929), and suggested to RSC that in a proposed derivative suit to be brought in Delaware by plaintiffs that it would be helpful if RSC, which had an obvious interest in plaintiffs' success, were to advance $10,000 as a retainer for Delaware counsel, plaintiffs agreeing to be responsible for other fees of their counsel at their minimum rates. RSC agreed, but such retainer was never paid.
On March 6, 1973, Civil Action 4138 was filed in this Court, and an argument date on plaintiffs' application for the granting of a temporary restraining order against the carrying out of the proposed sale of the south tract to White and Hill was scheduled by the Court for March 8, 1973.
In the meantime, White and Hill had apparently waived or satisfied all conditions precedent to its acquisition of the south tract prior to argument on plaintiffs' motion, RSC following suit on March 16, 1973, by apparently making a waiver of the same conditions precedent (which had been waived by White and Hill) in a brief filed with the Court on that date.
On March 22, 1973, the Court handed down its opinion in which it held that a restraining order would issue against the receipt by the corporate defendant of the votes of a majority of its shareholders for approval of the proposed sale to White and Hill, being of the view that the offers of both White and Hill and RSC being essentially the same, in that each now waived all conditions precedent, except that the latter offered more money, that stockholder approval of the White and Hill bid, as proposed, would not be in the best interest of the corporation.
In the meantime, Mr. Prappas, on March 9, 1973, had written to the plaintiffs concerning the fee arrangement made with his firm, setting forth the fees expected to be paid to both Texas and Delaware counsel in addition to the sum of $10,000 to be advanced by RSC Industries, such letter stipulating that plaintiffs' counsel:
"* * * shall have the right to petition the Court for the allowance of attorneys' fees and expenses, and the minimum hourly rates set forth herein shall not preclude either firm from petitioning *325 the Court for allowance of attorneys fees predicated upon the time involved, the number and complexity of legal issues involved and the results accomplished for the benefit of all the shareholders of Sugarland Industries."
Plaintiffs agreed.
Plaintiffs' complaint of March 6, 1973 in this Court prayed for the granting of a temporary restraining order against the taking of action on the White and Hill contract at the scheduled meeting of the stockholders of Sugarland Industries or for any sale of the real estate of Sugarland Industries:
"* * * at less than the best available price, and directing the individual defendants to perform their fiduciary duty to obtain the best available price in the sale of the property."
On March 22, 1973, the opinion of the Court was filed. It granted a restraining order which directed that a form of order was to be submitted containing the following terms:
"It will provide for the further adjournment of the presently noticed meeting of stockholders of Sugarland Industries, Inc. until April 30, 1973, so as to permit the board of directors of the corporate defendant to invite and receive bids for the sale of the corporate lands in issue, such bids to be based on the nonpecuniary terms and conditions of the present White and Hill proposal. Said board of directors will be ordered thereafter to submit the bid so conditioned containing the highest cash1 offer to the Sugarland stockholders for their vote.
1 "Payment of cash can be properly secured because of the nature of the asset to be sold."
An order on the Court's opinion having been entered on April 10, 1973, through compliance with it and as a result of required competitive bidding, the south tract was ultimately sold not to either White and Hill or RSC but to Gerald D. Hines, a Houston real estate investor and builder, on a bid in the amount of $37,229,069, of which $5,540,000 was cash as opposed to $5,000,000 in cash offered by White and Hill.
In like manner, following receipt of the higher Hines bid for the south tract, the latter's insistence that he also have an opportunity to acquire the north tract as well as the south ultimately resulted in the Morris Glenney offer of $5,597,896 for the north tract being surpassed by the Hines bid for said tract in the amount of $6,841,035, for which acquisition cash received by Sugarland Industries at the December 14th, 1973 closing with Hines was allocated along with a $700,000 long-term note with a specified 1973 present cash value of $313,129.
Petitioners contend that had it not been for their efforts in this litigation, the north tract would have been sold to Morris-Glenney for the sum of $5,597,896, the sale to Mr. Hines thus benefiting Sugarland Industries and its stockholders in the net amount of $1,243,139.
Turning to the complexities of discounting the notes here in issue, including a determination of at what rates the White and Hill note as well as the Hines note should respectively be discounted, objectants contend that the security value for each being only $20,018,856, the claimed fair value of the south tract, and the only security for the Hines note as well as that contemplated for the White and Hill note, that such value must therefor control the fixing of a value for each of said notes and that in order to determine the two respective present day values of such notes as of 1973 that the White and Hill note should be discounted at 10% and the Hines note at 16.77%. In an effort to obviate the need for fixing appropriate discount rates, counsel for plaintiffs have agreed to circumvent such problem by agreeing to have any allowance made to them by Court order in the form of fees payable out of the future benefits hoped to be received as a result of completion of payment for the Hines purchase of the south tract paid to them when, as, and if received by Sugarland Industries. The monetary benefits received to date and which are hoped to be received by Sugarland *326 Industries as a result of petitioners' efforts may be listed as follows:

north tract  additional cash value received
in 1973 $ 1,243,139[5]
 ------------
drainage easement  cash savings in
1973 $ 450,000[6]
 ---------
south tract  additional cash received
in 1973 $ 540,000
 __________
 sub-total  cash benefits received
 in 1973 $ 2,233,139
 -----------
south tract  additional cash received
1974-1977 $ 2,257,841
 ___________
 sub-total additional cash benefits
 to 7/1/78 $ 4,490,980
 -----------
south tract, additional cash expected to
be received by Sugarland Industries $17,321,634
 ___________
 total cash benefits $21,812,614
 -----------

Counsel for the individual defendants and for the stockholder, United States National Bank of Galveston, take the initial position, in opposition to plaintiffs' application for an award by this Court of fees and expenses,[7] that prior to their release of the plaintiffs as well as RSC from any obligation to pay attorney fees to petitioners that plaintiffs were under contract to pay such fees and that accordingly there was no contingency which would justify an award to petitioners by the Court. However, objectants overlook the fact that on March 9, 1973, plaintiffs' counsel wrote RSC:
"We can only hope that we have put Sugarland in the position that it will be required to sell the property at the best available price and if the Court so rules, you shall then have the opportunity to be able to purchase the property. At the same time, either White and Hill or some third party can offer a higher price."
In short, in light of such clearly stated position as to the course to be followed by petitioners in the future, which is reflected in the complaint filed in C.A. 4138, it is clear that petitioners were entirely candid in their dealings with plaintiffs and RSC. It is also clear that the purpose of plaintiffs' counsel ab initio was to obtain the best available price for the south tract and that when such appeared to be imminent, a result inconsistent with the plaintiffs' goals as individuals, as opposed to those espoused by them in their status as stockholders suing derivatively, counsel properly terminated their representation of plaintiffs as individuals, and, as noted above, made it known that they would not accept a $10,000 retainer from RSC. Furthermore, objectants ignore the fact that in point of fact White and Hill had given Sugarland Industries carte blanche to negotiate with RSC over the amount which the latter was willing to offer to pay for the south tract, bearing in mind that RSC had expressed a willingness to bid up to $30,000,000 for such land.
In short, had it not been for the initial activity of plaintiffs' Texas counsel, resulting in the formation of the joint venture known as RSC, there well might have been no offer before the board of directors and stockholders of Sugarland Industries higher than that of White and Hill with the result that the south tract would have gone to such bidder for $23,800,000, the opinion of the directors as to the adequacy of such bid in such a situation being no doubt supported *327 by the business judgment rule. Furthermore, the fee arrangement set forth in the letter of plaintiffs' Texas counsel of March 9, 1973, quoted from earlier in this opinion, made it quite clear that in the event counsel for plaintiffs were to be awarded fees by the Court, any fees paid by plaintiffs in the meantime would be refunded out of the fees allowed by Court order. In addition, there was, of course, never any agreement with Sugarland Industries as to an hourly rate to be paid plaintiffs' counsel for prosecuting plaintiffs' derivative action for the benefit of their corporation and its stockholders. Compare Thomas v. Western Natural Gas Company, Del.Ch., C.A. 2092, Feb. 11, 1974. Finally, I do not consider the Hines purchase a windfall for which petitioner may not claim credit because had there been no restraining order entered on plaintiffs' application, there would have been no Hines purchase.
These cases having been settled by Court order dated November 15, 1977 on the basis of a reorganization of the make-up of memberships and the adding of outside members to the various governing bodies of the Kempner family enterprises, and a fee application having been made for such accomplishment as well as for the results achieved on the first phase of the case, I conclude, notwithstanding the federal rule so well expressed in the case of Lindy Brothers Builders, Inc. et al. v. American Radiator & Standard Sanitary Corp. et al., C.A. 3, 487 F.2d 161 (1973) to the effect that the first line of inquiry of a federal court when asked to fix fees of counsel in a settled civil anti-trust case should be into the hours devoted to the litigation by the petitioning attorneys and in what manner such time has been spent, that in Delaware, in a settled derivative action in which a fund has been created as a result of the efforts and skills of counsel for plaintiff, the first inquiry has traditionally been into the nature and extent of the results obtained, Lewis v. Great Western United Corp., et al., Del.Ch., C.A. 5397, March 28, 1978. See also Treves v. Servel, Inc., Del.Supr., 154 A.2d 188 (1959), and Aaron v. Parsons, Del. Supr., 144 A.2d 155 (1958), although the other tests applied in Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp. et al., supra, in ruling on a fee application, namely the amount of time and effort applied to a case by counsel for plaintiff, the relative complexities of the litigation, the skills applied to their resolution by counsel, as well as any contingency factor and the standing and ability of petitioning counsel are, of course, considered in the award of fees in an appropriate case, Chrysler Corp. v. Dann, Del.Supr., 223 A.2d 384 (1966), aff'ing Dann v. Chrysler Corp., Del.Ch., 215 A.2d 709 (1965), McDonnell Douglas Corporation v. Palley, Del.Supr., 310 A.2d 635 (1973), and Richman v. DeVal Aerodynamics, Inc., Del.Ch., 185 A.2d 884 (1962).
The corporate defendant has stipulated that the compensible time devoted by counsel for plaintiffs to both phases of this litigation for the years 1973 through October, 1977 by firm members, associates, law clerks and paralegals totals 15,110.8 hours. Petitioners, on the other hand, claim to be entitled to credit for time in addition to that stipulated to by the corporate defendant, namely, for negotiating over fee agreements and in research on their right to attorneys' fees, as well as additional time on depositions, and in the Texas case filed by Lehman Brothers against Sugarland Industries for a commission, and finally for research on the application of the Rushing Trust theory to the taxes of stockholders of Sugarland Industries in liquidation.
Next, the tangible benefits allegedly gained for Sugarland Industries and its stockholders as a result of plaintiffs' filing of their application for injunctive relief and the successful prosecution of what petitioners term the first phase of this litigation, namely the blocking of the sale of the south tract to White and Hill, are as follows. First, as a result of obtaining the entry of a restraining order, the granting of which ultimately resulted in the sale of such tract to Gerald D. Hines for $37,229,069, as opposed to the White and Hill bid of $23,800,000, the right to be paid the sum of $13,429,069 more than the bid of the latter was gained. *328 Moreover, to achieve this benefit I am satisfied that the time devoted thereto did not terminate in April, 1973 but extended through renegotiations of the Hines proposal on the form of a contract until the final closing with Mr. Hines in December, 1973.
To this amount must be added the additional amount received on sale of the north tract to Mr. Hines rather than to Morris-Glenney, resulting in the receipt of additional cash in the sum of $1,243,139. Furthermore, as a result of the ownership of both tracts becoming vested in the name of a single owner the need for acquiring a drainage easement over the south tract was eliminated at an alleged savings of $240,000 to $450,000, such total benefits adding up to the sum of between $14,912,208 and $15,122,208.
Counsel for the corporate defendant and for the intervenor, United States National Bank of Galveston, on the other hand, question these conclusions, taking the position that while credit can be claimed by petitioners for blocking the White and Hill transaction, while acting for RSC, that the Hines bid was simply a windfall for which plaintiffs and their counsel may claim no credit. Furthermore, counsel for the corporate defendant contend that, in any event, inasmuch as the south tract serves as the sole security for the Hines' 6% note, as it was to have been for the White and Hill 6% note, and because, according to the petitioners' expert, Mr. Basden, the south tract has an actual value of only $20,018,856, that because of the difference in the amounts of the two notes, the ratio of debt to security in the case of each note is substantially different. Thus, in the case of the Hines note, the present obligor on such note now being Sugarland Properties, Inc., the value of the security is allegedly equal to only 63.2% of such debt as opposed to an alleged 100% in the case of the proposed White and Hill note, leading to different discounted values of the two notes, namely 10% in the case of the White and Hill note and 16.77% in the case of the Hines note. The conclusion reached by the corporate defendant is that the present value of the proceeds which would have ultimately been received from the White and Hill note is estimated to be $15,206,927 as opposed to the amount of $19,245,804 which may be expected to be received as a result of ultimate payment in full of the Hines note, now the obligation of Sugarland Properties, Inc. Moreover, it is contended that because of the alleged mistake on the part of Mr. Hines in making an unrealistically high bid, which has resulted in money problems in the development of the 7,500 acres here in issue and the need for vast financial support from the Ford Foundation to get Mr. Hines' development plans, which basically call for commercial and industrial development in the north tract and residential development in the south tract, off dead center, such plans appear doomed because of complex and expensive drainage problems, resulting in the postponement of installment payments on the note due Sugarland Industries. It is contended that the difference between the values of the two notes is actually in the neighborhood of $4,000,000 to $3,500,000 at the most, taking into consideration the higher cash deposit made by Hines. Accordingly, it is argued that the benefits allegedly brought about as a result of plaintiffs' effort in obtaining injunctive relief against stockholder approval of sale of the south tract to White and Hill has led to a much smaller benefit than that claimed by petitioners.
Nonetheless, as petitioners point out, a discount for the purpose of estimating the present value of the note of Sugarland Properties, Inc. is appropriate only if petitioners are to be paid fees now on the basis of the alleged benefits achieved as a result of their efforts in their so-called first phase effort to block the White and Hill sale and obtain the highest possible price for the south tract. However, as noted earlier in this opinion, petitioners have expressed their willingness to receive any fee allowed them on the basis of benefits allegedly gained by them insofar as the first phase of their efforts in this derivative action is concerned, when, as, and if received by Sugarland Industries, pointing out, on the other hand, that they are entitled to such percentage *329 of those pecuniary benefits already received by Sugarland Industries as a result of the activities of petitioners, such entity having, as of mid-1978, already received the sum of $2,257,841 more in cash than it would have received had the White and Hill deal been consummated in addition to the larger down payment over and above that proposed to be made by White and Hill.
As far as the north tract is concerned, I am satisfied that had it not been for the efforts of counsel for plaintiffs that just as the south tract would have been sold to White and Hill for a smaller price than that ultimately received from Mr. Hines, that, in like manner, the north tract would have been sold to Morris-Glenney for $5,597,896 instead of to Mr. Hines for $6,841,035, resulting in a benefit of $1,243,139 to Sugarland Industries and its stockholders. In short, had Mr. Hines not been brought into the picture as a result of petitioners' efforts, resulting in the Hines bid for the south tract, followed by his insistence that he also have the north tract, his acquisition of both tracts would not have materialized. I therefor conclude that petitioners are entitled to a fair percentage of the benefit inuring to Sugarland Industries and its stockholders as a result of Mr. Hines' successful bid for the north tract as well.
Next, as pointed out earlier, the sale of both the south and north tracts eliminated the need for the establishment of a drainage easement across the south tract for the benefit of the north tract. According to the minutes of a meeting of the board of directors of Sugarland Industries held on May 24, 1973, Harris L. Kempner, in recommending sale of both the south and north tracts to Mr. Hines, gave a value to the elimination of the need for such drainage easement of $450,000. Plaintiffs, however, have expressed the view that the elimination of the need for the drainage easement in question would actually save Sugarland Industries the sum of $240,000, and such figure will be employed by the Court in allowing petitioners an appropriate percentage of corporate benefits grained through their efforts.
I turn now to the so-called second phase of these cases which was principally concerned with damages allegedly suffered by Sugarland Industries, and its stockholders in the alleged amount of many millions of dollars attributable to action or inaction on the part of the board of directors of the corporation under the leadership of Harris L. Kempner.
However, as plaintiffs' case for the recovery of damages for the corporate defendant on the above theory was about to be tried and after counsel for the individual defendants had moved to dismiss these actions on the ground that the appearances of non-resident corporate directors had been improperly compelled under the provisions of 10 Del.C. Section 366, citing Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the parties entered into settlement negotiations, and on November 15, 1977, this litigation was settled by Court order after a hearing on notice on the basis of a stipulation of settlement which provided inter alia that while the individual defendants continued to deny that any action taken by them as directors of Sugarland Industries was responsible for the matters complained and while no dollar figure was fixed on such benefit, conceded that:
"[The settlement] and the actions that it contemplates provide a substantial, real benefit to the body of stockholders of Sugarland, constituting a proper basis and appropriate, commensurate consideration for the settlement of the remaining claims of Sugarland, which is itself in the course of liquidation."
However, this rather ambiguous recital does not define exactly what tangible benefits were secured for Sugarland Industries and its stockholders as a result of the efforts exerted on the part of plaintiffs' counsel because it is not made entirely clear how valid plaintiffs' claims for damages were and how the settlement relates to them.
Civil Action 4174, filed on April 30, 1973 and the supplemental complaint in Civil Action 4138 basically sought the granting of an order from this Court directing *330 the defendant directors to account for losses allegedly suffered by Sugarland Industries as a result of the sale of the north tract for less than an adequate price, two service stations, a shopping center in the Town of Sugar Land and an unimproved half-acre lot located next to one of the service stations mentioned above. And while plaintiffs alleged in their complaints that these pieces of real estate were ultimately disposed of to Mr. Hines or his nominees for inadequate consideration, plaintiffs' claims as to the handling of such real estate have been put to rest by the November 15, 1977 settlement, approved by Court order entered that date, a settlement not being a rehearsal of a trial, Braun v. Fleming-Hall Tobacco Company, Del.Supr., 93 A.2d 495 (1952), and Krinsky v. Helfand, Del.Supr., 156 A.2d 90 (1959).
Plaintiffs' remaining claims made in Civil Action 4174, or by way of the supplemental complaint in Civil Action 4138, are concerned with the alleged improper payment of counsel fees to lawyers, particularly those fees incurred and paid in connection with the Lehman Brothers commission litigation as well as in settlement of the White and Hill claim based on their claimed rights in the contract allegedly entered into by that firm with Sugarland Industries on February 20, 1973, for the alleged breach of which White and Hill had originally claimed damages in the amount of $1,242,906. Also sought as damages were fees required to be paid by Sugarland Industries to the Houston firm of Baker & Botts for services rendered to such corporation over the period February 1, 1971 through February 1, 1974, involving the proposed sale of Sugarland Industries real estate and the ultimate liquidation of the corporation.
Petitioners contend that had the claims for damages been brought to trial rather than settled in the interests of family harmony that millions of dollars would have been recovered, but that rather than further disrupting the Kempner family through continued litigation, a reorganization of the personnel of the boards or managements of the various Kempner interests with the principal purpose in mind of seeking to curtail the assertion of power in family affairs exercised up to the time of settlement by Harris L. Kempner and those family members under his alleged dominance, as well as by William C. Griffith, attorney for many years for Sugarland Industries, was agreed on.
Thus, under the terms of the settlement agreement approved by order of the Court on November 16, 1977, Harris L. Kempner agreed not to seek re-election to the board of directors of the following Kempner controlled corporations, namely those of Imperial Sugar Company and of Foster Farms. Furthermore, Mr. Griffith was removed from the board of directors of Galbank, a corporation which owned 40% of the outstanding shares of stock of Bancshares, the board of which was increased from ten to thirteen members with seven memberships ultimately to go to outsiders. Bancshares, in turn, controls the objectant United States National Bank of Galveston. In the settlement also stipulated to were arrangements for the removal of Harris Weston from the Sugarland Grantor's trust as well as the removal of James C. Kempner from membership in Sugarland's Deed of Trust.
In like manner the board of directors of Imperial Sugar Company was increased from twelve to fourteen members of which six were to be outsiders, and the board of Sugarland Telephone Company was increased so as to include the plaintiff Lyda Q. Thomas as a member. A similar expansion of the board of directors of Foster Farm was also effected so as to include Mrs. Thomas and two outsiders. In addition, Harris L. Kempner agreed not to stand for re-election to its board of directors.
To provide continuity to such changes of management under fixed procedures for voting, Mrs. Thomas and Jack T. Currie, an independent business man, was named to the board of directors of the Harris and Eliza Kempner Fund, which holds a substantial number of shares of Sugarland Industries, of Bancshares, Imperial Sugar, Sugarland Telephone Company and of Foster Farms.
*331 Next, the settlement agreement contained arrangements of several years' duration to the effect that the individual defendants would place their stock in the hands of a committee authorized to vote such stock. Such defendants also agreed to encourage other family member stockholders to join such committee. In addition, Harris Weston was replaced as a trustee of the Grantor's trust, the holder of the $31,000,000 Hines note, by an independent real estate expert named Carl Mueller for the purpose of resisting demands for concessions as to the terms of the Hines purchase. However, because of his intimate knowledge of the history of efforts to liquidate the real estate of Sugarland Industries and the various agreements and alleged agreements made concerning disposal of said lands, including his own commitments, Mr. Harris L. Kempner was retained as one of the three trustees of such trust.
Another claimed benefit of the settlement here in issue is allegedly found in arrangements made for most of those with an equity interest in Sugarland Industries to liquidate their holdings in H. Kempner, a Massachusetts unincorporated trust, in which its investors' interests had been virtually frozen prior to the settlement here in issue.
Finally, petitioners claim that they are responsible for disposal by settlement of the Lehman Brothers claim for a commission in excess of $1,000,000 for their efforts in finding a buyer for the real estate here in issue, namely White and Hill, a case which was filed in Texas by White and Hill against Sugarland Industries, in which the plaintiffs intervened as defendants, having been ultimately settled for $170,000.
I conclude, principally on the basis of the results achieved in the so-called first phase of this case, taking into consideration the other factors set forth earlier in this opinion, culminating in the final closing with Gerald D. Hines in December, 1973, that counsel for plaintiffs are entitled now, in addition to payment of their expenses and disbursements in the conceded amount of $161,459.52, to 20%[8] of the fund created through their efforts, as hereinafter limited, of which amount petitioners are to be paid now only such percentage of that portion of moneys in excess of the White and Hill bid received to date as a result of consummation of the Hines transaction, the balance of such fee to be paid if, as and when periodically received from Sugarland Properties, Inc., or its successors or assigns, such fee, however, not to exceed $3,000,000, plus expenses.
As to the second phase application I am satisfied that petitioners are entitled to be compensated on the non-pecuniary results of their efforts to bring harmony to the Kempner family although such benefit does not inure directly to the benefit of Sugarland Industries and its stockholders.
In this regard, I am of the opinion that time and effort devoted to negotiating for agreements and fees, time spent representing RSC, additional time spent on depositions, as well as time spent on the out-of-state litigation of Lehman Brothers v. Sugarland Industries may not be included. As to the last claim compare Kutik, et al. v. O. C. G. Technology, Inc., Del.Ch., C.A. 4422, October 9, 1974, and see Hitchcock v. American Pipe and Construction Company, 90 N.J.Eq. 576, 107 A. 267 (1919). I am also satisfied that as in the case of the time and effort allegedly put in by petitioners on the application of the Rushing Trust theory to the diminution of the taxes of all of the stockholders of Sugarland Industries in liquidation, the time and effort applied to the Lehman Brothers Texas case were redundant in view of the fact that both these matters were primarily the concern of representatives of Sugarland Industries and were not germane to the basic purposes of plaintiffs' derivative actions. Insofar as petitioners have advised plaintiffs on tax *332 questions affecting their personal interest in the Sugarland Industries liquidation, they should look to them for compensation.
Petitioners will be allowed the amount of $500,000 for the time expended and effort exerted by them during the second phase of this case, which resulted in a settlement which promises to terminate the feud which has split the Kempner family in recent years, thus indirectly benefiting Sugarland Industries and its stockholders. Compare Dann v. Chrysler, supra, and Chrysler Corporation v. Dann, supra, such sum to be paid out of funds received to date, and, if necessary, and to be received by Sugarland Industries as a result of this litigation.
As to petitioners' claim to the payment of interest on their award before the entry of an order on their application, no precedent is cited. It will be disallowed.
An appropriate form of order may be submitted on notice.
NOTES
[1] These 7500 acres have been historically divided into a 5,928 acre south tract and a 1,304 acre north tract. In addition, as of 1973, the plantation contained a park of approximately 230 acres and a drainage strip of approximately 33 acres. Also situate on the property at the time were a small shopping center, two service stations, and a small commercial tract. Situated in a flood plain of the Brazos River, one of the major rivers of Texas, which drains an area of 44,640 square miles and flows 840 miles from New Mexico to the Gulf of Mexico some 80 miles downstream from the town of Sugar Land, which adjoins Sugarland plantation, has historically been subject to flooding and consequent drainage problems which have impeded and still impede its development into either a viable commercial or residential area, particularly in the case of the north tract.
[2] Thomas L. James.
[3] Prior to the sending of the letter to Lehman Brothers, at a meeting of those principally responsible for the conduct of the affairs of Sugarland Industries, a general consensus had been reached that the entire tract of some 7500 acres was worth some $30,000,000.
[4] A change ultimately required by plaintiff Lyda Ann Thomas' later refusal to consent to a sale of shares of stock in Sugarland Industries held by her individually or together with her husband, or as custodian for her children.
[5] Includes defendants' agreed-upon 1973 cash value of $313,129 for a $700,000 non-interest note.
[6] Gained by selling both the south tract and the north tract to the same entity at the stated value given by Harris L. Kempner.
[7] For the monetary benefits allegedly achieved in the so-called first phase of the case, i. e. blocking the sale to White and Hill, and thus enabling the Hines' purchase ultimately to take place, petitioners, applying a 20% rate and including interest from 1973, ask for an award of between a low of $3,481,196 and a high of $3,916,000.

For the non-monetary benefits allegedly gained as a result of settlement of plaintiffs' claim for damages suffered by Sugarland Industries and its stockholders as a result of acts or failures to act on the part of the individual defendants, which are of course difficult to appraise in dollars, petitioners ask to be awarded a fee of $2,429,300, essentially on a time basis with fees doubled. Petitioners and defendants have agreed that petitioners have incurred expenses and disbursements in connection with this litigation in the amount of $161,489.52.
[8] In light of the amounts here involved such percentage appears high, Gerlach v. Gillam, Del.Ch., C.A. 909, settlement hearing, May 16, 1958, but compare Thomas v. Western Natural Gas Company, supra, were it not for some doubt over the ultimate payment of the Hines note in full.